FILED
05/07/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2025

## STATE OF TENNESSEE v. DYLAN RAY THOMPSON

**Appeal from the Circuit Court for Fayette County**
No. 22CR140     J. Weber McCraw, Judge

———————————————————

### No. W2024-01541-CCA-R3-CD
———————————————————

Defendant, Dylan Ray Thompson, was convicted by a Fayette County jury of first degree premeditated murder, aggravated assault, and unlawful possession of a handgun by a convicted felon. After a sentencing hearing, the trial court imposed an effective sentence of life plus eight years. Defendant appeals, arguing that the evidence was insufficient to support each of his convictions and that the trial court erred in aligning his sentences consecutively. Upon review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT H. HOLLOWAY, JR., and STEVEN W. SWORD, JJ., joined.

Bo Burk, District Public Defender, and Terry Dycus, Assistant Public Defender, Somerville, Tennessee, for the appellant, Dylan Ray Thompson.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Mark Davidson, District Attorney General; and Falen Chandler and Raven Icaza, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On the evening of September 21, 2022, M.T.[1] greeted her father, Bradley Thompson, at his truck when he returned home from his work at a car repair shop close to

---

[1] Because it is the policy of this court to protect the identity of minor victims, we will identify M.T. by her initials. Additionally, because Bradley Thompson and Kenneth Thompson share a last name, for clarity, we will refer to each of them by their first name. No disrespect is intended.

his home. When a "small gray car" pulled up to the house, Bradley exited his truck and walked toward the car; M.T. was approximately five feet behind Bradley. Bradley said, "What's up bubba," and the driver of the car began shooting. M.T. thought the driver "shot three times and then [she] started running and she thought [she] heard another shot while [she] was running[.]" M.T. was "[v]ery scared" and thought she would "lose [her] life that day." M.T. hid in the woods until her grandfather, Kenneth Thompson, found her. M.T. described the shooter as "kinda big, not really but he was like easily two hundred pounds, maybe six foot, was wearing blue overalls and I think a gray T-shirt." She identified Defendant in court as the man who shot her father.

Kenneth Thompson, Bradley's father and M.T.'s grandfather, lived across from Bradley and M.T. on Denniston Road. On the day of the shooting, Kenneth and Bradley had both walked home from "the shop" where Bradley worked. Kenneth went to feed his dog and then planned to walk over to Bradley's house. While Kenneth was feeding his dog, approximately 150 feet away from Bradley, he saw "a little gray car" pull up to Bradley's house. He heard Bradley say, "What's up[?]" and then the driver of the gray car "started shooting." Kenneth ran into his house to get his firearm, came back outside, and fired one shot as the gray car "[s]ped out of the driveway."

On cross-examination, Kenneth explained that it was not uncommon for Bradley to walk home when he was on breaks at work. Kenneth denied that he had spoken to the loggers working near his and Bradley's homes on the day of the offense but stated that the "guys that Brad worked with said that Brad talked to [Defendant]."

At the time of the offense, Defendant was employed by Bussinger Logging, which was owned by Jacob Bussinger and his brother; Mr. Bussinger identified Defendant in court. He testified that on the day of the offense, Defendant wore "overalls and a white shirt" to work. He explained that Bussinger Logging was moving its equipment from an old job site on Bobbit Road to a new job site on Denniston Road. Mr. Bussinger worked at the Bobbit Road location loading equipment, which Defendant then transported to the Denniston Road location. At the end of the workday, Mr. Bussinger drove Defendant from the Denniston job site to the Bobbit Road job site for Defendant to pick up his "silver Honda." According to Mr. Bussinger, he and Defendant would usually "talk about [Defendant's] horse, or fishing, or his truck," but on the day of the offense, Defendant got in the truck, Mr. Bussinger tried to "strike up conversation" but there was no conversation.

Oakland Police Department ("OPD") Sergeant John Ford responded to a "shots fired" call at Bradley's residence ("the Denniston Road scene"). Sergeant Ford identified a photograph of the scene which was entered into evidence. The photograph showed Bradley's residence, a red truck parked near the residence, and Bradley's body lying face-down in the driveway. Sergeant Ford collected a bullet from under Bradley's body and

shell casings from the Denniston Road scene. OPD Patrolman Ronald Carpenter also responded to the scene and collected a bullet fragment that Bradley's family had found in a tree. The bullets and shell casings were sent to the Tennessee Bureau of Investigation ("TBI") for ballistics analysis.

OPD Lieutenant Kevin Perry also responded to the Denniston Road scene. Lieutenant Perry walked the scene with officers and developed Defendant as a suspect; he identified Defendant in court. Defendant was taken into custody and when questioned, he confirmed that he had been near the Denniston Road scene earlier that day. Lieutenant Perry obtained a search warrant for Defendant's DNA and was present when another officer collected Defendant's DNA by swabbing the inside of Defendant's cheek. The DNA test was sent to the TBI for analysis. Based on his investigation, Lieutenant Perry concluded that Defendant shot and killed Bradley. Lieutenant Perry identified a certified copy of Defendant's 2014 conviction for felony theft which was admitted into evidence.

On cross-examination, Lieutenant Perry confirmed that he also collected gunshot residue from Defendant's hand. He also confirmed that the judgment for Defendant's 2014 theft conviction did not indicate that Defendant was prohibited from possessing a handgun.

Fayette County Sheriff's Office ("FCSO") Sergeant Mark Hale was dispatched to Defendant's parents' residence on Ebenezer Loop ("the Ebenezer Loop scene"). He observed a "gray or silver vehicle" parked in front of the house and the hood of the vehicle was still warm which indicated to him that it had recently been driven. Photographs of the vehicle were entered into evidence and showed that the vehicle was a gray or silver four-door Honda sedan.

TBI Special Agent Kylee Bright responded to the Denniston Road scene where officers had collected "three .40 caliber shell casings, one .9 millimeter shell casing, and one Jimenez Alarms firearm." Special Agent Bright then assisted in executing a search warrant at the Ebenezer Loop scene. In Defendant's bedroom, officers found "blue overalls, a gray T-shirt, . . . a Glock 23, .40 caliber pistol, [and] a gun box containing a .40 caliber magazine[.]" Special Agent Bright also collected a gunshot residue kit from the interior driver side of the Honda.

Dr. Danielle Harrell, an expert in pathology, performed Bradley's autopsy on September 22, 2022. She explained that Bradley had suffered four gunshot wounds: two to his head, one to his back, and one to his right shoulder. Dr. Harrell determined that Bradley's manner of death was homicide, and the cause of death was multiple gunshot wounds. On cross-examination, Dr. Harrell testified that three pocketknives and a lighter were found in Bradley's possession at the time of the autopsy.

TBI Special Agent Russell Davis, II, an expert in gunshot primer residue testing, received gunshot residue kits that were collected from a 2006 Honda Accord and Defendant's hand. He also conducted gunshot primer residue testing on the overalls and t-shirt collected from Defendant's bedroom. Testing of residue from the Honda Accord and the overalls were positive for the presence of particles characteristic of gunshot primer residue but the kits used to collect residue from Defendant's hands and the gray t-shirt were negative. Special Agent Davis agreed that the t-shirt could have been negative because it was covered by the overalls. Special Agent Davis explained that gunshot residue "disappear[s] very quickly from hands[.]"

TBI Special Agent Jordan Johnston, an expert in the field of DNA analysis, testified that TBI had received DNA swabs collected from Defendant, the Glock 23 .40 caliber firearm collected from Defendant's bedroom, a magazine for the Glock 23 .40 caliber firearm, and shell casings. Defendant's DNA was found on the magazine but there was not enough DNA on the shell casings to obtain a DNA profile. The firearm was not tested for DNA.

TBI Special Agent Joseph Kennedy testified as an expert in the field of forensic science with a specialty in firearms analysis. He received and analyzed the firearm evidence in this case; his report was admitted into evidence. According to his report, Special Agent Kennedy received the Glock 23 .40 caliber pistol, magazine, and eight .40 caliber cartridges collected from the Ebenezer Loop scene; one bullet and one "copper jacket fragment from under Bradley"; three .40 caliber cartridge casings from the Denniston Road scene; and one "fired bullet and copper jacket fragment from [the Denniston Road] scene[.]" Special Agent Kennedy determined that the three cartridge casings found at the Denniston Road scene were fired from the Glock 23 .40 caliber found in Defendant's bedroom. The eight .40 caliber cartridges from the Ebenezer Loop scene were "visually consistent in type and design to the [three] cartridge cases" found at the Denniston Road scene. Testing was inconclusive on the rest of the evidence submitted.

The State then rested its case, and the trial court denied Defendant's motion for judgment of acquittal. Defendant elected not to testify and did not present further proof.

Based on the above proof, the jury convicted Defendant as charged of first degree premeditated murder (count one), aggravated assault of M.T. (count three), and unlawful possession of a firearm by a convicted felon (count four).[2]

---

[2] Defendant was indicted for aggravated child abuse in count two. However, the judgment for count two reflects that it was nolle prosequied without costs and it does not appear from the record that count two was presented to the jury.

The trial court conducted a sentencing hearing on August 7, 2024. The State introduced Defendant's presence report which showed various traffic offenses, a 2005 possession of marijuana conviction, 2010 and 2013 possession of drugs convictions, 2014 convictions for driving under the influence and felony theft, and two violations of probation for the 2014 convictions. According to a letter from Court Specialist/PSI Writer Karina Stanford, the presence report was only partially completed because Defendant declined to speak with Ms. Stanford. The State introduced two victim impact statements from Melanie Glover, Bradley's sister, one in her capacity as M.T.'s guardian and one for herself.

Ms. Glover testified that Bradley's death had turned her "world . . . upside down." Since the offense, Ms. Glover had gained custody of M.T. and explained that M.T. still suffered "[t]remendously." M.T. "acted out. She's scared. Any loud noise, she gets scared. We can't do fireworks. We can't do anything of that nature because it all takes her back to that day. She is in counseling but it doesn't help." Bradley also had two sons, one who no longer spent time with the family because Bradley was "the glue from [their] family and [they] don't have that." Ms. Glover then read a handwritten victim impact statement into the record. She requested that the court impose a life sentence without parole.

Kenneth testified that at the time of sentencing, two years after the offense, Bradley's death still affected him. He explained that he and Bradley were "[c]loser than two peas in a pod." Kenneth requested that the court impose "the death penalty, just like he did to [his] son."

Defendant gave an unsworn statement in which he explained that the current offense occurred because he was trying to prove the innocence of his daughter who he referenced had been raped repeatedly and kidnapped. He stated:

> [O]nce I gained knowledge of [the incident with Defendant's daughter], that's what caused for my arrest with [Bradley] and their family and everything. Your Honor, I don't think it's fair by no means to - - I'm just trying to get the right sentence -- and still today I don't -- I don't understand how I'm going to be sentenced with people bearing false witness and just lies and discrepancies. I still don't understand how I'm going to be sentenced.

After hearing argument from the parties, the trial court announced that count one carried an automatic life sentence with parole. Regarding the other two convictions, the court found that Defendant was a Range I, standard offender. It stated that it had considered the evidence presented at trial and at sentencing, the presentence report, the victim impact statements, the parties' arguments regarding potential sentences, the nature and

- 5 -

characteristics of the criminal conduct, Defendant's potential for rehabilitation, and Defendant's statement on his own behalf. *See* T.C.A. § 40-35-210(b). The trial court found no applicable mitigating factors. *See id.* § 40-35-113. It applied enhancement factor one, that Defendant had criminal convictions beyond those necessary to establish his range, to all counts. *See id.* § -114(1). It also applied enhancement factor four, that M.T. was especially vulnerable because of her age, and enhancement factor ten, that Defendant had no hesitation about committing a crime when the risk to human life was high, to count three. *See id.* § -114(4), (10).

The trial court denied alternative sentencing for counts three and four because it found that "there's little expectation [Defendant] will be rehabilitated." It further found that Defendant would be unlikely to abide by the terms of probation, that it was in the interest of society to be protected from future criminal conduct of Defendant, and that alternative sentencing would unduly depreciate the seriousness of the offense. It stated that it "heavily consider[ed]" the facts and circumstances of the offense along with the nature and circumstances of Defendant's conduct. It further noted its consideration of the presentence report, Defendant's physical and mental condition and social history, and Defendant's previous actions and character.

The trial court found that consecutive alignment of the sentences was appropriate because Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime or crimes in which the risk to human life was high. *See id.* § 40-35-115(4). It specifically found that the length of the sentences reasonably related to the severity of the offense and that confinement for an extended period of time is necessary to protect society from Defendant. Further, the trial court found that Defendant did not have a willingness to lead a productive life and resorted to criminal activity in furtherance of an anti-societal lifestyle "[b]ased on his prior record[.]"

The trial court sentenced Defendant to six years at 100% for count three, and two years at 85% for count four, with all counts to be served consecutively for an effective sentence of life plus eight years.

Defendant filed a timely motion for new trial, which was denied on October 7, 2024. Defendant's timely appeal is now properly before this court.

**Analysis**

I.  Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support each of his convictions.  Specifically, he asserts that the State failed to establish that he acted with premeditation to support count one; that he "ever aimed at . . . or threatened" M.T. to support count three; and that the State "failed to prove that [he] was barred from possessing a firearm" to support count four.  The State asserts that the evidence was sufficient for each conviction.  We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e).  The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  Further, circumstantial evidence need not remove every reasonable hypothesis except that of guilt. *Id.* at 381 (quoting *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)).  "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275).  Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379.  A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)).  This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

## First Degree Murder

First degree murder is the "premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). Premeditation requires that an act is done:

> after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(e). As there is often no direct evidence of a defendant's state of mind, "premeditation may be proved by circumstantial evidence[.]" *State v. Davidson*, 121 S.W.3d 600, 614-15 (Tenn. 2003). The existence of premeditation is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). The jury "cannot speculate what was in the killer's mind," *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007), but it may consider the following non-exclusive list of factors to infer premeditation:

> (1) use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; (6) calmness immediately after the killing; (7) a lack of provocation on the victim's part; and (8) a defendant's failure to render aid to a victim.

*State v. McKinney*, 669 S.W.3d 753, 773 (Tenn. 2023) (citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017)). Additionally, "the firing of multiple shots can allow a jury to infer premeditation." *State v. Hoosier*, No. M2022-01305-CCA-R3-CD, 2024 WL 3566745, at *7 (Tenn. Crim. App. July 29, 2024), *no perm. app. filed*. Finally, motive is not an element of first degree murder, but it is one of many factors that may support a finding of premeditation. *State v. Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *36 (Tenn. Crim. App. Apr. 8, 2019); *State v. Bell*, 512 S.W.3d 167, 191 (Tenn. 2015).

When viewed in the light most favorable to the State, the evidence showed that Bradley had recently arrived at his house when a small gray or silver car pulled in front of

the house. When Bradley greeted the person in the vehicle, the driver of the vehicle then fired at least four shots at Bradley before driving away from the scene. Bradley died as a result of the gunshot wounds. M.T. described the shooter as wearing overalls and a gray t-shirt, which was consistent with what Mr. Bussinger described Defendant wearing at work that day. Mr. Bussinger testified that as he drove Defendant to his silver Honda after work, Defendant was unusually non-communicative. M.T. identified Defendant in court as the man who shot Bradley. At the Ebenezer Loop scene, officers observed a gray Honda parked in the front yard, and located overalls, a gray t-shirt, and a Glock 23 .40 caliber firearm and magazine in Defendant's bedroom. The driver side of the Honda and the overalls tested positive for gunshot residue, Defendant's DNA was on the magazine, and Special Agent Kennedy determined that the Glock 23 .40 caliber firearm fired the cartridge casings found at the Denniston Road scene.

Defendant asserts that the State failed to establish premeditation because the State did not present evidence of Defendant's motive for the killing. However, as stated above, motive is not an element of first degree murder and is only one of many factors that a jury may consider in determining premeditation. The jury could have reasonably found the existence of premeditation based on Defendant's unusual demeanor while in the car with Mr. Bussinger, the lack of provocation from Bradley, Defendant's procurement of a weapon, Defendant's firing at least four shots at Bradley, and Defendant's failure to render aid. The evidence was sufficient to support Defendant's conviction for first degree premeditated murder.

### Aggravated Assault

As relevant to this case, aggravated assault is assault that "[i]nvolved the use or display of a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(iii). A firearm is a deadly weapon. *Id.* § 39-11-106(a)(6). An assault occurs when a person "intentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-11-101(a)(2). A person acts knowingly when the person is either aware of the nature of the conduct or aware that the conduct is reasonably certain to cause the result. *Id.* § 39-11-106(a)(23). The defendant's use of a deadly weapon is a "nature of conduct" element and the victim's being placed in fear of imminent bodily injury is a "result of conduct" element. *State v. Williams*, No. W2021-01071-CCA-R3-CD, 2022 WL 17728221, at *8 (Tenn. Crim. App. Dec. 16, 2022) (citing *State v. Stroud*, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn. Crim. App. Oct. 29, 2007)), *no perm. app. filed*.

Defendant asserts that "no conclusive proof was presented by the State that [Defendant] ever aimed at . . . or threatened" M.T. However, M.T. testified that she was approximately five feet behind Bradley when Defendant began shooting at him. M.T. ran and hid in the woods because she was "[v]ery scared" and thought that she "was going to

lose [her life[.]"  Defendant's act of shooting Bradley while M.T. was only a short distance from Bradley was reasonably certain to cause M.T. to fear imminent bodily injury, or even death.  *See State v. Rickman*, No. W2022-01272-CCA-R3-CD, 2024 WL 3633812, at *7 (Tenn. Crim. App. Aug. 2, 2024) (finding the evidence sufficient to support aggravated assault when the defendant fired a gun at the victim's father while the victim stood a short distance away), *perm. app. denied* (Tenn. Jan. 23, 2025).  The evidence was sufficient to support Defendant's conviction for the aggravated assault of M.T.

**Unlawful Possession of a Handgun**

It is unlawful for a person to possess a handgun who has been convicted of a felony. T.C.A. § 39-17-1307(c)(1).  A handgun is "any firearm with a barrel length of less than twelve inches (12") that is designed, made or adapted to be fired with one (1) hand[.]"  *Id.* § 39-11-106(a)(19).  Defendant does not contest that he possessed the handgun or that he had previously been convicted of a felony offense.  Rather, Defendant asserts that the State failed to prove that he was prohibited from possessing a firearm because the judgment for his 2014 felony theft conviction was "devoid of any language that advises the defendant that he was prohibited from owning or possessing a firearm."

Defendant cites no authority, and we find none, that requires a judgment of a felony conviction to include language prohibiting the convicted from possessing a handgun. Indeed, this court has repeatedly upheld convictions for unlawful possession of a handgun by a convicted felon where the judgment does not specifically prohibit the possession of a handgun following the conviction, including instances where the parties stipulate to the defendant's status as a convicted felon.  *See State v. Robinson*, No. W2016-01803-CCA-R3-CD, 2017 WL 5952925, at *6, 8 (Tenn. Crim. App. Nov. 29, 2017) (finding that the evidence was sufficient after a bifurcated trial when the jury found the defendant guilty of aggravated robbery in the first phase, thus implicitly finding that he possessed a firearm, and a stipulation that read "the 'State and defense are stipulating that [the defendant] has previously been convicted of aggravated assault'"); *State v. Jenkins*, No. E2017-01983-CCA-R3-CD, 2018 WL 6113468, at *7 (Tenn. Crim. App. Nov. 20, 2018) (upholding conviction under subsection (c)(1) in part because the "State and defense counsel stipulated before trial that the [d]efendant was a convicted felon; the [d]efendant does not now dispute that he had prior felony convictions"); *State v. Anderson*, No. M2022-00262-CCA-R3-CD, 2023 WL 2620672, at *5 (Tenn. Crim. App. Mar. 24, 2023) (upholding conviction in part because "certified judgments of the defendant's prior convictions were entered into evidence without objection" with no discussion of the language on the judgments), *perm. app. denied* (Tenn. June 28, 2023).

Because the evidence was sufficient to support each of Defendant's convictions, he is not entitled to relief.

## II. Sentencing

Defendant argues that the trial court erred in imposing above-minimum sentences for counts three and four and by aligning his sentences consecutively. Specifically, he asserts that the trial court failed to consider statistical information provided by the administrative office of the courts before imposing the sentences. The State argues that the trial court properly exercised its discretion in sentencing Defendant. We agree with the State.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions, including the alignment of sentences, under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Pollard*, 432 S.W.3d 851, 859-62 (Tenn. 2013) (quoting *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012)). "In short, we will uphold the trial court's sentencing decision on appeal 'so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute.'" *State v. Smith*, No. M2023-00367-CCA-R3-CD, 2024 WL 1699210, at *5 (Tenn. Crim. App. Apr. 19, 2024) (citing *Bise*, 380 S.W.3d at 709-10), *no perm. app. filed*. "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

As an initial matter, we note that Defendant's brief includes one sentence stating that he "believes that the [c]ourt erred in not granting probation on [c]ounts [three] and [four]." To the extent Defendant intended to raise this issue, it is waived because Defendant provides no argument or legal authority to support this assertion. *See* Tenn. R. App. P. 27(a)(4), (a)(7); Tenn. Ct. Crim. App. R. 10(b).

**Length of Sentences**

Once a trial court determines the appropriate range of punishment, a trial court must consider any evidence received at trial and the sentencing hearing, the presentence report, the purposes and principles of sentencing, any argument for alternative sentencing, the nature and characteristics of the criminal conduct involved, evidence regarding enhancement and mitigating factors, statistical information provided by the administrative office of the courts regarding sentencing practices for similar crimes, any statement the defendant makes on his own behalf, and the results of a validated risk and needs

- 11 -

assessment.  T.C.A. § 40-35-210(a), (b).  Additionally, the sentence imposed shall be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  *Id.* § 40-35-103(2), (4).

Defendant asserts that the enhancement of his sentence above the minimum sentence was excessive because the trial court did not consider statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee.  *See* T.C.A. § 40-35-210(b)(6).  However, our review of the record indicates that the trial court clearly considered the required statutory considerations.  In fact, the trial court explicitly stated that it was required to consider certain factors and listed multiple of the considerations under Tennessee Code Annotated section 40-35-210(b)(6). *See State v. Cheairs*, No. W2024-00312-CCA-R3-CD, 2025 WL 407435, at *12-13 (Tenn. Crim. App. Feb. 5, 2025) (applying presumption of reasonableness to the trial court's sentencing decision despite its failure to specifically state consideration of statistical information), *perm. app. pending*; *State v. Henderson*, No. W2022-00882-CCA-R3-CD, 2023 WL 4105937, at *6 (Tenn. Crim. App. June 21, 2023) (stating that explicit consideration of section 40-35-103(4) is not required so long as the record shows the trial court articulated reasons for imposing the sentence such that it facilitates appellate review), *no perm. app. filed*.

After finding that Defendant was a Range I, standard offender, the trial court imposed maximum within-range sentences of six years for aggravated assault and two years for unlawful possession of a handgun by a convicted felon.  *See* T.C.A. § 40-35-112(a)(3), (a)(5) (mandating that a Range I sentence for a Class C felony is between three and six years, and for a Class E felony is between one and two years).  Defendant does not contest the trial court's application of three enhancement factors to count three and one enhancement factor to count four.  *See id.* § -114(1), (4), and (10).  "[A]pplication of a single enhancement factor is sufficient to justify the imposition of the maximum sentence in the range."  *State v. Williamson*, No. M2019-00898-CCA-R3-CD, 2020 WL 2781593, at *3 (Tenn. Crim. App. May 28, 2020) (citation omitted).  The trial court did not abuse its discretion in imposing maximum within-range sentences.

**Consecutive Sentences**

This court gives deference "to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861.  The trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that the "defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a

crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). Before imposing consecutive sentences based upon this classification, the trial court must find that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995); *see Pollard*, 432 S.W.3d at 863 (holding that the *Wilkerson* factors still apply after adoption of the abuse of discretion standard). Additionally, consecutive sentencing is guided by general sentencing principles providing that the length of the sentence be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting T.C.A. §§ 40-35-102(1) and -103(2)).

First, Defendant asserts that the trial court failed to consider statistical information from the administrative office of the courts before imposing consecutive sentences. However, as discussed above, the trial court properly considered the statutory factors outlined in Tennessee Code Annotated section 40-35-210 before imposing Defendant's sentence.

Next, Defendant asserts that his sentence was excessive because he will be at least "[eighty-four] years old" when he is eligible for parole for count one and will then be required to serve an additional eight years for counts three and four. However, Defendant's age and lengthy sentence for his first degree murder conviction do not render consecutive sentencing improper or his sentence inherently excessive. *See State v. Richardson*, No. W2011-01434-CCA-R3-CD, 2012 WL 2307902, at *5 (Tenn. Crim. App. June 18, 2012) (upholding an effective forty-one-year sentence because consecutive sentencing was not inherently unjust because "the defendant's sentences may already be lengthy due to the seriousness of the crimes he committed" and "the defendant is in his forties, in poor health, and serving a federal sentence"); *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *16-17 (Tenn. Crim. App. Mar. 20, 2024) (upholding trial court's imposition of consecutive sentences, for an effective forty-year sentence, based on the forty-nine-year-old defendant's extensive criminal history), *no perm. app. filed*. The trial court made specific findings that the aggregate length of Defendant's sentence was reasonably related to the severity of the offense and necessary to protect the public. *See* T.C.A. § 40-35-115(b)(4); *Wilkerson*, 905 S.W.2d at 939.

Finally, Defendant argues that "his sentence was excessive in light of the circumstances surrounding the offense. Based on the record as a whole, [the] severity of the sentence does not match the offense for which he [was] convicted." Defendant presents no further argument or specific citations to the record or to appropriate authority and, thus, this argument is waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Waiver notwithstanding, the trial court's finding that the aggregate length of the sentence

- 13 -

was reasonably related to the severity of the offense is more than adequately supported by the record. The trial court did not abuse its discretion in ordering consecutive alignment of Defendant's sentences. Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.


s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE